J-A15042-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| IN RE: V.E.S., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: O.S.V., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 280 MDA 2025 |

Appeal from the Decree Entered December 5, 2024
In the Court of Common Pleas of Dauphin County Orphans' Court at
No(s): 85 AD 2023

| IN RE: E.N.S., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: O.S.V., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 281 MDA 2025 |

Appeal from the Decree Entered December 5, 2024
In the Court of Common Pleas of Dauphin County Orphans' Court at
No(s): 86-AD-2023

BEFORE: BOWES, J., STABILE, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:         **FILED: JULY 17, 2025**

      O.S.V. ("Father") appeals from the December 5, 2024, decrees entered

in the Court of Common Pleas of Dauphin County involuntarily terminating his

parental rights to his son, V.E.S., born in March of 2017, and daughter, E.N.S.,

---

[*] Former Justice specially assigned to the Superior Court.

born in November of 2018 (collectively, "the Children"), pursuant to 23 Pa.C.S.A. § 2511(a)(1) and (b).[1,2]  We affirm.

This appeal arises from petitions filed by A.E.M. ("Mother") on November 27, 2023, and entered pursuant to Pennsylvania Orphans' Court Procedure 4.6 on November 29, 2023, for the involuntary termination of Father's

---

[1] The orphans' court initially terminated Father's parental rights to the Children by decrees entered on April 8, 2024, and Father timely appealed.  This Court vacated the decrees because the court failed to appoint counsel to represent the Children's legal interests pursuant to 23 Pa.C.S.A. § 2313(a) of the Adoption Act.  ***See In re V.E.S. and E.N.S.***, 329 A.3d 636 (Pa. Super. 2024) (unpublished memorandum).  We remanded the case and directed the orphans' court to determine whether the Children's guardian *ad litem* ("GAL"), who represented their best interests during the involuntary termination proceeding, may also represent their legal interests.  ***See id.*** at 5 (citing ***In re P.G.F.***, 247 A.3d 955, 964 (Pa. 2021)).  If the court determined that no conflict existed between the Children's dual interests, then we directed the court to re-enter the decrees involuntarily terminating Father's parental rights.  ***See id.***  Upon remand, the orphans' court ultimately determined that no conflict existed between the Children's legal and best interests.  On December 5, 2024, the court re-entered the decrees involuntarily terminating Father's parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(1) and (b).

[2] Following re-entry of the decrees, Father's appellate counsel withdrew her representation, and the court appointed new counsel.  On February 12, 2025, Father's new counsel filed a motion for leave to file an appeal *nunc pro tunc*, which the orphans' court granted by order entered on February 18, 2025.  Father filed notices of appeal from the decrees on February 27, 2025, which this Court consolidated *sua sponte*.  However, Father failed to file and serve, concurrently with his notices of appeal, concise statements of errors complained of on appeal in violation of Pa.R.A.P. 1925(a)(2)(i).  On March 5, 2025, Father filed the concise statements.  Because Mother does not assert prejudice as a result of Father's untimely filing, and we are unaware of any, we do not dismiss this appeal.  ***See In re K.T.E.L***, 983 A.2d 745, 747 (Pa. Super. 2009) (holding that the failure to file a concise statement of errors complained of on appeal with the notice of appeal will result in a defective notice of appeal, to be disposed of on a case-by-case basis).

parental rights. On the same date, Mother's husband, C.A.M. ("Stepfather"), filed petitions for adoption of the Children. The involuntary termination hearing occurred on April 5, 2024.[3]

The relevant facts and procedural history are as follows. Father and Mother, formerly husband and wife (collectively, "the parents"), married in 2016. Father is originally from the Dominican Republic. *See* Notes of Testimony ("N.T."), 4/5/24, at 73. They separated in February of 2021, when Mother left the marital residence with the Children and initiated divorce and child custody actions. *See id.* at 10. The parents divorced in August of 2021. *See id.* Mother married Stepfather in September of 2022. *See id.* at 7.

The initial custody order, the date of which is unspecified in the record, was agreed-upon by the parents and awarded them shared legal custody, Mother primary physical custody, and Father partial physical custody on alternating weekends and for three hours every morning, Monday through Friday. *Id.* at 11-12. According to Mother, Father "barely ever" exercised custody under the order. *Id.* at 11.

Mother sought to modify the initial custody order, and, following trial, by order dated August 11, 2022, the court maintained Father's partial physical custody on alternating weekends, but limited his custody during the week to

---

[3] Mother testified on her own behalf and presented the testimony of Stepfather. Father testified on his own behalf and presented the testimony of M.R., who is Mother's grandmother and the Children's great-grandmother.

three hours on Tuesday evenings. *See id.* at 13; *see also* Petitioner's Exhibit A at ¶ 2(B). In addition, the order directed the parents to "participate in [V.E.S.]'s counseling, as directed by the therapist." *Id.*; *see also* Petitioner's Exhibit A at ¶ 23. V.E.S. was then seven years old and receiving "trauma therapy" due to Mother's fear that he had been molested.[4] *Id.* at 14, 32.

Later that same month, on August 26, 2022, Father was charged with crimes involving recklessly endangering another person.[5] *See id.* at 18, 46-48; *see also* Petitioner's Exhibits B, I. Specifically, Father was accused of putting sugar into the gas tank of Mother's car in August of 2021, which caused her car to break down while she was driving with E.N.S. as a passenger. *Id.* at 18-19. On November 1, 2022, Father was released from prison on bail conditioned, in part, upon his contact with the Children being solely supervised. *See* Petitioner's Exhibit I; N.T. at 21, 103.

As a result of Father's criminal charges and bail conditions, Mother filed a petition to modify the custody order, which resulted in two separate *interim* custody orders, discussed *infra*. She also filed a protection from abuse ("PFA") petition against Father on behalf of herself, the Children, and Stepfather.

---

[4] It is unclear from the record whether V.E.S. was, in fact, molested.

[5] The criminal charges against Father remained pending at the time of the subject proceeding. Father ultimately pled guilty to disorderly conduct on May 1, 2024, for which he was sentenced to a probationary term. *See* Orphans' Court Opinion ("O.C.O"), 6/12/24, at 3 n.1.

The first *interim* custody order was agreed upon by the parents and dated December 20, 2022. The order awarded Father biweekly supervised custody at the YWCA. ***See id.*** at 21; ***see also*** Petitioner's Exhibit C. Mother testified that Father did not exercise supervised physical custody under the terms of this first *interim* order. ***See id.*** at 22.

Shortly thereafter, on January 5, 2023, the court issued a final PFA order against Father on behalf of Mother, the Children, and Stepfather, which expired on July 5, 2024. The PFA order prohibited Father from having "any contact" with any of the protected parties. PFA Order, 1/5/23, at ¶ 3. Further, the PFA order provided "additional relief" which directed that Father, within ten days of entry of the PFA order,

(1) contact AMEND or JOURNEYMEN Advancement to receive an evaluation for the **batterer's intervention counseling program**. Upon completion of the evaluation, [Father] is further ordered to comply and follow through with any recommendations resulting from the evaluation. . . ;

(2) participate in a **psychological evaluation** provided by a licensed clinical psychologist and comply with any recommendations resulting from the evaluation. . .;

(3) contact the IMPACT parenting coordinator to enroll in, and successfully complete, **the IMPACT Parenting Class (minimum of 6 sessions)**. Upon completion of Parenting Classes, [Father] is further ordered to comply and follow through with any recommendations resulting from the participation in Parenting Classes. . . .

PFA Order, 1/5/23, at ¶ 8 (emphasis added). The PFA order expressly provided that Father "shall provide proof of any completed evaluation to Dauphin County Court Administration immediately upon completion." ***Id.***

The second *interim* custody order was also agreed upon by the parents and was dated February 27, 2023. This order awarded Mother sole legal custody. The order restricted Father "to indirect access to the [C]hildren's records and/or updates of the [C]hildren's school and medical information. Father may make a monthly request *via* email to Mother by the 30th of each month. Mother will then have two days to provide said updates." *Interim Order*, 2/27/23, at ¶ 1. Moreover, the order provided:

> 2. Upon completion of the filing of proof of the satisfaction of Father's conditions from the [PFA] Order dated January 5, 2023, Father may have supervised bi-weekly visits at the YWCA. . . .
>
> 3. Once the criminal investigation is completed, the parties will have thirty days to contact the conciliator to schedule a follow-up conference.

*Id*. at ¶¶ 2-3.[6] In March of 2023, Father relocated to Harlem, New York, where he remained at the time of the subject proceeding. *See* N.T. at 115.

By November 27, 2023, when Mother filed the involuntary termination petitions, there is no dispute that Father had not filed proof of satisfaction of any of the conditions listed in the PFA order as directed by the second *interim*

---

[6] We glean from the record that Father was required to submit proof of satisfaction of the conditions to the YWCA, which would then contact Mother to schedule Father's supervised physical custody. *See* N.T. at 109, 113-14 (Father's testimony that he took paperwork to the YWCA in January of 2024, which then contacted Mother to schedule supervised visitation). In addition, Mother was required to complete an orientation at the YWCA, which she testified that she did after the December 2022 *interim* custody order. *See id.* at 130-31 (Mother testified, "I went [to the YWCA], gave them the documents. They told me when [Father] scheduled, they would be in contact with me to bring [the] Children. He never did.").

custody order. Thus, Father had not participated in any supervised visits with the Children. The certified record reflects that he last saw the Children in October of 2022, and last spoke to them, according to Mother, in November of 2022. *See* N.T. at 25. Further, Mother testified that Father did not send Christmas gifts to the Children; however, he sent a birthday card to E.N.S. in November of 2022. *Id.* at 27.

The Children had been in counseling for some time since the parents' separation up through and including the termination hearing. *Id.* at 26. Specifically, Mother testified that V.E.S. had been attending counseling since November of 2021. *Id.* In addition to her fear that he had been molested, she testified that V.E.S. is diagnosed with autism as well as attention deficit hyperactive disorder ("ADHD"), for which he is prescribed medication. *Id.* at 7-8. Mother testified that E.N.S. "started counseling in June of 2023, but she was involved with [V.E.S.]'s prior counseling as [it also included] family counseling." *Id.* at 26.

As stated *supra*, the orphans' court involuntarily terminated Father's parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(1) and (b). Following Father's second appeal after re-entry of the decrees, the orphans' court issued an opinion pursuant to Pa.R.A.P. 1925(a) on March 11, 2025, wherein it relied upon the reasoning set forth in its Pa.R.A.P. 1925(a) opinion filed on June 12, 2024, which related to Father's first appeal.

On appeal, Father raises the following issues for review:

I.     Whether the [orphans'] court erred and/or abused its discretion by terminating the parental rights of Father pursuant to 23 Pa.C.S.A. § 2511(a)(1), that he did not relinquish parental claim to the Children and that he did not fail to perform his parental duties?

II.     Whether the [orphans'] court erred and/or abused its discretion by terminating the parental rights of Father pursuant to 23 Pa.C.S.A. § 2511(b), by failing to give primary consideration to the developmental, physical and emotional needs and welfare of the Children?

Father's Brief at 7 (cleaned up).[7]

Our standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record.  If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion.  A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.  The trial court's decision, however, should not be reversed merely because the record would support a different result.  We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

**In re T.S.M.**, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.  This Court has explained:

Subsection (a) provides eleven enumerated grounds describing particular conduct of a parent which would warrant involuntary termination.  In evaluating whether the petitioner proved grounds under § 2511(a), the trial court must focus on the parent's conduct and avoid using a "balancing or best interest approach." **Interest of L.W.**, 267 A.3d 517, 524 n.6 (Pa. Super. 2021).  If

_____

[7] The GAL has not filed a brief in this appeal.

the trial court determines the petitioner established grounds for termination under § 2511(a) by clear and convincing evidence, the court then must assess the petition under § 2511(b), which focuses on the child's needs and welfare.

*In re M.E.*, 283 A.3d 820, 830 (Pa. Super. 2022) (some internal quotation marks and citations omitted). The moving party must establish the statutory grounds under both Section 2511(a) and (b) by clear and convincing evidence, which is evidence that is so "clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* (citation omitted).

In this case, the relevant statutory provisions are as follows:

**(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

. . .

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).

With respect to Section 2511(a)(1), our Supreme Court has reiterated

the following long-standing principles:

> To terminate parental rights under Section 2511(a)(1), the party seeking termination must prove that "[t]he parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties."  23 Pa.C.S. § 2511(a)(1). "Parental duties" are not defined in the Adoption Act, but our courts long have interpreted parental duties "in relation to the needs of a child[,]" such as "love, protection, guidance and support."  **In re Burns**, 474 Pa. 615, 379 A.2d 535, 540 (1977). Parental duties are carried out through affirmative actions that develop and maintain the parent-child relationship.  **In re Adoption of C.M.**, [667 Pa. 268,] 255 A.3d [343,] 364 [(2021)]. The roster of such positive actions undoubtedly includes communication and association. **Id.** (citing **In re Adoption of Smith**, 412 Pa. 501, 194 A.2d 919, 920 (1963)).  The performance of parental duties "requires that a parent exert himself to take and maintain a place of importance in the child's life." **Id.** (internal citations omitted).  Fortitude is required, as a parent must act with "reasonable firmness" to overcome obstacles that stand in the way of preserving a parent-child relationship and may not wait for a more suitable time to perform parental responsibilities. **Id.**
>
> Of importance is the General Assembly's emphasis in Section 2511(a)(1) on the six months immediately preceding the filing of the termination petition when evaluating a parent's conduct.  Although courts are to avoid the mechanical application of the Adoption Act, we may not ignore that the General Assembly has drawn focus to the six months immediately preceding the filing of the termination petition.  Indeed, quite recently this Court addressed this aspect of Section 2511(a)(1) and reaffirmed that for an analysis thereunder, the most critical period for evaluation is the six months immediately preceding the filing of the termination petition. **C.M.**, 255 A.3d at 367.
>
> When considering a request to terminate rights under Section 2511(a)(1), a parent's failure or refusal to perform parental duties "must be analyzed in relation to the particular circumstances of the case." **Burns**, 379 A.2d at 540; **see also Adoption of David**

*C.*, 479 Pa. 1, 387 A.2d 804, 807 (1978). . . . Thus, the focus of the inquiry is on whether, under the circumstances, the parent has acted with reasonable firmness in refusing to yield to the obstacles that have prevented the performance of parental duties. *In re M.A.K.*, 489 Pa. 597, 414 A.2d 1052, 1054 (1980); *see also C.M.*, 255 A.3d at 365 (providing that inquiry focuses on whether under the circumstances, the parent has utilized all available resources to preserve the parent-child relationship). . . .

Consideration of the totality of the circumstances includes evaluation of the following: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between the parent and child, if any, including any efforts made by the parent to reestablish contact with the child; and (3) the effect that termination of parental rights would have on the child pursuant to Section 2511(b). *C.M.*, 255 A.3d at 365; [*Adoption of Charles E.D.M., II*, [550 Pa. 595], 708 A.2d [88], 92 [(1998)]; [*In re Adoption of Atencio*], [539 Pa. 161], 650 A.2d [1064], 1066-67 [(1994)]. We reiterate that the purpose of this analysis is to give effect to our mandate that courts avoid a mechanical application of the law regarding the termination of parental rights. The law must be applied with the purpose of serving needs and welfare of each individual child in his or her particular circumstances. *C.M.*, 255 A.3d at 364; *In re T.S.M.*, 620 Pa. 602, 71 A.3d 251, 268-69 (2013).

*In re Adoption of L.A.K.*, 265 A.3d 580, 592-93 (Pa. 2021) (paragraph break inserted).

With respect to the aforementioned bifurcated analysis, Section 2511(b) mandates that the "primary consideration" for a court in considering an involuntary termination petition is the child's "developmental, physical and emotional needs and welfare." *In the Interest of K.T.*, 296 A.3d 1085, 1105 (Pa. 2023) (quotation marks omitted); *see also* 23 Pa.C.S.A. § 2511(b). The child's bond with the parent, "plus permanency, stability and all 'intangible' factors may contribute equally to the determination of a child's specific

developmental, physical, and emotional needs and welfare, and thus are all of 'primary' importance in the Section 2511(b) analysis." **K.T.**, 296 A.3d at 1109. Our Supreme Court emphasized that courts

> must consider whether, in the context of all these factors, the parental bond is "necessary and beneficial" to the child. **See** [**In re N.A.M.**, 33 A.3d 95, 103 (Pa. Super. 2011)] (courts "must examine the status of the bond to determine whether its termination would destroy existing, necessary and beneficial relationship") (quotation marks omitted). **See also Int. of M.E.**, 283 A.3d 820, 836–37 ([Pa. Super.] 2022) (To the extent there is a bond, the trial court must examine whether termination of parental rights will destroy a "necessary and beneficial relationship[.]")

**K.T.**, 296 A.3d at 1109.

Turning to Father's first issue, he argues that the court abused its discretion in terminating his parental rights pursuant to Section 2511(a)(1) because Mother made "consistent efforts" to remove him from the Children's lives, but he nonetheless made efforts toward reunification. **See** Father's Brief at 17. Specifically, Father asserts that, after his marital separation, he was actively involved with the Children until approximately August of 2022, when Mother "began to unilaterally decrease" his custodial periods and advised the Children that "they could call" Stepfather their father. **Id.** at 15 (citing N.T. at 70). Father alleges that Mother's motive in this regard was for Stepfather to replace him as the Children's parental figure. **See id.** at 14-15.

With respect to the criminal charges lodged against Father in August of 2022, he acknowledges that the bail conditions set forth in the November 1, 2022, bail order reduced his contact with the Children to supervised physical

custody. Father baldly asserts that he requested supervised visits, but Mother refused to allow them. *See id.* at 15.

Further, Father acknowledges that his supervised visits with the Children were subsequently conditioned upon his filing proof of satisfaction of the three requirements in the January 5, 2023, PFA order. *See* Father's Brief at 16; *see also Interim* Custody Order, 2/27/23. Father claims that he provided proof that he completed the

> Journeyman Batterer's Program on or about February 4, 2023
> . . . . Father completed his parenting class counseling in January
> of 2023, and provided proof of completion. Lastly, Father started
> counseling in March of 2023, and received his completion letter in
> November 2023.

*Id.* (citing N.T. at 92, 105) (cleaned up). Father then asserts that

> Upon receiving the completion letters/certificates for all of his
> imposed requirements, Father went to the YWCA, filled out the
> appropriate paperwork, and requested that supervised visitation
> with the Children begin. The YWCA reached out to Mother to
> schedule visitation, but Mother would not cooperate.

*Id.* (citing N.T. at 109, 113).

Finally, Father asserts that he subsequently "filed a contempt as a result of Mother withholding visitation. Father also filed a petition for modification after Mother refused to comply with supervised visits." *Id.* at 17 (citing N.T. at 104, 109). Upon review, we conclude that Father is not entitled to relief.

Contrary to Father's arguments on appeal, in terminating his parental rights pursuant to Section 2511(a)(1), the orphans' court found that "it was Father's own actions that created the primary stumbling blocks limiting his

ability to parent" for approximately thirteen months before the filing of the

termination petitions on November 27, 2023. O.C.O. at 17. The court

explained:

> Father's custodial rights were initially limited as of November 1, 2022, to supervised visitation, as a bail condition resulting from Father's criminal behavior, which conditions were memorialized in a December 20, 2022, agreed upon [*interim* custody order] permitting Father's supervised visitation at the YWCA bi-weekly. Father failed to exercise custody under this order. Even before his custodial rights were severely limited around November 2022, Father had only minimally exercised custody between the date of his separation from Mother in February 2021, through the end of 2022, as credibly testified to by Mother. . . .
>
> As a result of the January 5, 2023, final PFA order, which prohibited Father from any contact with the Children, the parties later entered into a February 27, 2023, custody order, which explicitly provided Father with a clear and defined roadmap for resumption of his parental rights *via* bi-weekly supervised visitation at the YWCA, if he could follow and complete the modest requirements placed in the PFA order. . . .
>
> While Father was able to complete the batterer's counseling program, he admittedly failed to complete the required parenting class, and the psychological evaluation, as ordered and/or provide the court with evidence of the completion of that evaluation. These requirements were substantive and designed to provide Father with resources and insight into his parenting skills and psychology so as to provide him with tools to remedy his parental deficiencies. . . .
>
> In addition, between February 2023 and November 2023, Father never once acted affirmatively and positively to obtain and exercise supervised custody, despite believing he had completed all conditions required to resume supervised visitation under the terms of the February 27, 2023, *interim* custody order. . . . The obstacles in Father's path to maintaining contact with the Children were surmountable had Father followed the clear requirements and exhibited firmness in seeking resumption of his parental relationship under the terms of the *interim* custody order (incorporating the PFA order conditions).

- 14 -

*Id.* at 17-18 (cleaned up).

Our review of the record supports the court's findings. Mother testified that she "very much" wanted Father to be an involved parent following their marital separation, but Father exercised custody only inconsistently. N.T. at 11-14. To the extent that Father testified he fully exercised his partial physical custody award prior to the November 1, 2022, bail order, the orphans' court was well within its discretion to make credibility determinations in Mother's favor and against him. *See id.* at 75-77 (Father's testimony that he exercised his partial physical custody schedule).

With respect to what actions Father took to participate in supervised physical custody with the Children, Father testified that he went to the YWCA one time before relocating to New York in March of 2023, and Mother was unwilling to bring the Children for visitation. *Id.* at 113. Father clarified as follows on cross-examination by the GAL:

Q. You accepted the response that one time Mo[ther] wasn't willing to have visitation?

A. Well, [I was] waiting to have my papers[. T]hat way I can file them. I didn't have any visit.

*Id.* at 114. This testimony revealed that, assuming Father visited the YWCA prior to moving to New York, he did not file proof of satisfaction of the PFA order requirements at that time, which was a necessary predicate to his supervised physical custody award under the February 27, 2023, *interim* custody order.

Indeed, during the subject proceeding, Father introduced, and the court admitted, Respondent's Exhibit 2 ("Exhibit R-2"), which included (1) a certificate of completion from Journeymen Advancement dated February 4, 2023, and (2) a two-page document representing a visit summary from Father's psychotherapy appointment on March 5, 2023, at Life Stance Health. *Id.* at 87, 107-08.  Father testified that he did not receive the documentation from the separate providers included in Exhibit R-2 until approximately March and November of 2023, respectively.  *Id.* at 106-08.  Father testified that the service providers would not release the relevant documents included in Exhibit R-2 until he submitted payment for the services.  *Id.* at 108.  Father explained that he paid a portion of his balance owed for the psychotherapy visit in November of 2023, and that he entered a payment plan for the remaining balance of $600 at that time.  *Id.* at 111-12.

The record is clear that Father did not *attempt* to file proof of satisfaction of the requirements with the YWCA until January of 2024, which is at least one month after he received notice of the filing of the termination petitions, *i.e.*, November 29, 2024.  *See id.* at 113-14.  To the extent that Father relies upon this belated compliance in support of his arguments, the orphans' court was precluded from considering this evidence pursuant to Section 2511(b). *See* 23 Pa.C.S.A. § 2511(b) ("With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated

subsequent to the giving of notice of the filing of the petition."); Pa.R.O.C.P. 4.6(b) (providing that the clerk is required to "note in the docket the date when notice was given to the interested party or to his or her counsel").

However, there is no evidence that Father participated in a psychological evaluation. *See id.* at 118 (Father's testimony that he did not know if he participated in a comprehensive psychological evaluation). In addition, Father did not complete a parenting course through IMPACT, the agency required by the PFA order. Rather, Father testified that he attended a different parenting class required in the child custody action. *Id.* at 110-11. Thus, Father did not comply with the second and third requirements of the PFA order. As such, we discern that his supervised physical custody award was never triggered prior to or since notice of the filing of the termination petitions.

Ultimately, on cross-examination by the GAL, Father testified as follows with respect to his accusation that Mother kept the Children from him.

> Q. In your testimony, you said Mother kept you from the [C]hildren. When you said you attempted to see them, what does that mean exactly?
>
> A. Well, after the bail condition, I tried to contact her to answer the phone. I tried to see the kids.

*Id.* at 112 (formatting altered). In both his overall testimony and argument in his brief, Father places the blame solely on Mother for his failure to perform his parental duties and not on his own criminal conduct and subsequent failure to follow the "clear and defined roadmap" set forth by the custody court to resume his parental duties. O.C.O. at 17. The totality of the record evidence

belies his narrative. As such, we conclude that the orphans' court did not abuse its discretion in determining that Father, for approximately one year immediately preceding the filing of the termination petitions, has refused or failed to perform his parental duties. Accordingly, Father's first issue fails.

With respect to Section 2511(b), Father argues that "he and the Children have a strong bond due to his extensive involvement with the Children for the first two and three years of their lives." Father's Brief at 19. Accordingly, he argues that the orphans' court erred in terminating his parental rights pursuant to Section 2511(b). Father's claim is without merit.

The orphans' court found as follows, in relevant part, with respect to the considerations that govern Section 2511(b):

> [T]he [C]hildren are currently thriving in their current living situation with Mother and [Stepfather]. V.E.S. in particular has exhibited vast improvement over the past year in overcoming his behavioral problems through therapy. . . .
>
> . . .
>
> While there were times in the past when the [C]hildren looked forward to visiting Father, there was no evidence presented that they currently want to see Father or are emotionally bonded with him inasmuch as they no longer ask about him or express any desire to see him. . . . In addition, [the C]hildren have expressed fears about being taken away from Mother's home by Father. (N.T. at 31, 36).
>
> . . .
>
> The evidence additionally reflected that [Stepfather] has a close relationship with the [C]hildren, helps meet their daily needs, supports them financially, is actively involved in their schooling, activities, therapy and implements recommended parenting techniques including regulation of V.E.S.'s emotions when he has

- 18 -

difficulties. The [C]hildren regularly refer to [Stepfather] as "dad." . . .

O.C.O. at 20-22. Both Mother's and Stepfather's testimony supports the court's findings.

There are indications in the record that the Children previously shared a bond of some type with Father. Specifically, Mother testified that "sometimes" the Children would look forward to seeing Father prior to the imposition of the bail condition that limited him to supervised physical custody and the subsequent custody orders. N.T. at 31. However, Mother testified that bond has faded with Father's absence, and that, at the time of the termination hearing, the Children do not ask about Father, and they call Stepfather "dad." *Id.* at 31-32, 37. Assuming, *arguendo*, that the Children have some form of bond with Father, it is clear that their true parental bond lies with Mother and Stepfather.

With respect to V.E.S.'s special needs, Mother testified that he "graduated from" trauma therapy in June of 2023 "because of so much success." *Id.* at 32. She testified that V.E.S. continues in therapy for "regular emotion regulation" and to reinforce the skills learned. *Id.* Mother testified on cross-examination by the GAL that V.E.S. has expressed in therapy that he "never wants to see" Father again. *Id.* at 38.

Stepfather testified at length regarding the parental duties he performs with respect to the Children. For instance, Stepfather explained that he, in part, coaches the Children's baseball team, and attends parent-teacher

conferences as well as medical appointments in a parental capacity. ***See id.***

at 60-61. Stepfather also testified as follows:

> Q. Have the [C]hildren expressed any concern to you about [F]ather?
>
> A. They fear for their safety.
>
> Q. Was that something said to you by [E.N.S.] or [V.E.S.] or both?
>
> A. Both.
>
> Q. . . . Was it a conversation you are having about their father?
>
> A. It's mainly dreams that they have of him breaking in and taking them from us.
>
> Q. Is that both children?
>
> A. Yeah.
>
> Q. So they have dreams of [F]ather breaking into your home and taking them?
>
> A. Yes.
>
> Q. Is that something they are working on in their counseling sessions?
>
> A. Yes.
>
> Q. Trying to unfold what that means?
>
> A. Yes.
>
> Q. Are those consistent dreams that they have?
>
> A. Once a month we have it. . . . Usually [we have] to lay in bed to calm them down. Once they fall asleep, we leave the room.

***Id.*** at 66-67. Stepfather also confirmed his intent to adopt the Children should

Father's parental rights be terminated. ***Id.*** at 61.

Based on the foregoing and our review of the totality of the testimonial evidence, there is ample support for the court's decision to terminate Father's parental rights pursuant to Section 2511(b). On this record, there is no evidence that the Children have a necessary and beneficial relationship with Father. Indeed, the Children last saw Father in October of 2022, when V.E.S. was five years old, and E.N.S. was three years old. Since that time, they have lived in an intact home with Mother and Stepfather. *Id.* at 59. Stepfather performs all the duties of a parent, and the Children call him "Dad." *Id.* As such, we discern no abuse of discretion by the court in concluding that termination of Father's parental rights will serve the Children's developmental, physical, and emotional needs and welfare. Father's second claim fails. Accordingly, we affirm the decrees pursuant to 23 Pa.C.S.A. § 2511(a)(1) and (b).

Decrees affirmed.

Judgment Entered.

_____

Benjamin D. Kohler, Esq.
Prothonotary

Date: 7/17/2025